IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT NASHVILLE

JUNE 1997 SESSION



**FILED**

**December 1, 1997**

**Cecil W. Crowson**
**Appellate Court Clerk**

STATE OF TENNESSEE,                 )
                                    )
          APPELLANT,                )
                                    )        No. 01-C-01-9607-CC-00313
                                    )
                                    )        Humphreys County
v.                                  )
                                    )        Leonard W. Martin, Judge
                                    )
                                    )        (State Appeal)
NORMAN CURTIS, KEITH CHAMBERS,      )
GINA CHAMBERS, AND SHELLY BRAGG,    )
                                    )
          APPELLEES.                )


FOR THE APPELLANT:

John Knox Walkup
Attorney General & Reporter
500 Charlotte Avenue
Nashville, TN 37243-0497

Eugene J. Honea
Assistant Attorney General
450 James Robertson Parkway
Nashville, TN 37243-0493

Dan M. Alsobrooks
District Attorney General
P.O. Box 580
Charlotte, TN 37036-0580

George C. Sexton
Assistant District Attorney General
Humphreys County Courthouse
Waverly, TN 37185

FOR THE APPELLEES:

Dale M. Quillen
Attorney at Law
95 White Bridge Road, Suite 208
Nashville, TN 37205
(Counsel for Curtis and Bragg)

Michael J. Flanagan
Attorney at Law
95 White Bridge Road, Suite 208
Nashville, TN 37205
(Counsel for Keith and Gina Chambers)


OPINION FILED:_____


AFFIRMED


Joe B. Jones, Presiding Judge

# O P I N I O N

The State of Tennessee (state) appeals as of right from a judgment of the trial court suppressing evidence seized by law enforcement officers from the person of Norman Curtis without a search warrant, and the residences of the Chamberses and Curtis under color of a search warrant. Two issues are presented for review. The state contends there were exigent circumstances which permitted officers executing the search warrant at the Chamberses' residence to enter the dwelling without complying with the "knock and announce" requirement. The state further contends the search of Norman Curtis's person when he arrived at the Chamberses' residence while the officers were executing the search warrant was reasonable. After a thorough review of the record, the briefs submitted by the parties, and the law governing the issues presented for review, it is the opinion of this court that the judgment of the trial court should be affirmed. The State of Tennessee has failed to illustrate why the evidence contained in the record preponderates against the findings made by the trial court.

Phoenix, Arizona, police officers received information that a pound of crystal methamphetamine was being shipped to Keith Chambers at his residence in McEwen, Tennessee. The Arizona officers contacted Humphreys County officers and the Drug Task Force for the 23rd Judicial District. It was agreed the package would be shipped to a Clarksville, Tennessee, address designated by the Task Force officers via United Parcel Service (UPS).

When the package was received, the officers took it to their office and conducted a field test on the content of the package to determine the nature of the substance. It tested positive for crystal methamphetamine. The officers borrowed a UPS truck and a UPS uniform to deliver the package to the Chamberses' residence. Later, an officer posing as a UPS driver delivered the package to the residence.

A Task Force officer was at the residence of a circuit court judge while the delivery was taking place. After the package containing the crystal methamphetamine was delivered, an officer called the judge's residence and advised the officer there that the package had been delivered. The judge then signed a search warrant which had been

prepared in advance. The warrant authorized the officers to search the Chamberses' residence. Several officers convened at a nearby location prior to the execution of the search warrant. When the officer arrived with the search warrant, the officers went to the residence to execute the search warrant.

As the officers approached the Chamberses' residence, Officer Davis stated he saw "a silhouette . . . of a human being" through a window. He could not determine if the person was a male or female. Nor could Officer Davis state the area of the residence where he saw the silhouette. The person allegedly closed the window and left the area of the residence "fairly quickly." According to Officer Davis:

> We expedited the execution of the search warrant for our own safety as well as anything else that could have happened as for the evidence being destroyed. We expedited that as to the fact of going on into the house and searching it.

All of the officers admitted they did not observe the "knock and announce" requirement when executing the search warrant at the Chamberses' residence. The officers entered the residence as soon as they reached the door. The package, which had been delivered to the residence, was found inside a garbage bag in the Chamberses' bedroom.

While the officers were searching the Chamberses' residence, Norman Curtis arrived in his truck and approached the back door of the residence. Before Curtis was able to enter the residence, two officers detained and searched his person for evidence. The search revealed Curtis was not armed. An officer removed Curtis's wallet and searched it. The officer found an exact duplicate of the shipping label on the package containing the crystal methamphetamine which was delivered to the Chamberses' residence earlier that day. The officers searched Curtis's pickup truck and found a small digital scale.

The officers candidly admitted they searched Curtis's person for evidence. The state attempted to justify the search based upon information an officer had received implicating Curtis in the sale and distribution of crystal methamphetamine.

## I.

When the parties in a criminal prosecution have been afforded an evidentiary hearing on the merits of a motion to suppress to ventilate the grounds raised in the motion, the findings of fact made by the trial court are binding upon the appellate court unless the evidence contained in the record preponderates against these findings. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996); State v. Harris, 919 S.W.2d 619, 622 (Tenn. Crim. App. 1995); State v. Tuttle, 914 S.W.2d 926, 931 (Tenn. Crim. App. 1995); State v. Dick, 872 S.W.2d 938, 943 (Tenn. Crim. App.), per. app. denied, (Tenn. 1995). This standard of review was created due to the fact the trial court, as the trier of fact, hears the evidence and views the witnesses. As a result, the trial court assesses the credibility of the witnesses, determines the weight and value to be afforded the evidence adduced during the hearing, and resolves any conflicts in the evidence. However, an appellate court is not bound by the trial court's conclusions of law.

In this case, the State of Tennessee has the burden of illustrating to this court that the evidence contained in the record preponderates against the findings of fact made by the trial court. Braziel v. State, 529 S.W.2d 501, 506 (Tenn. Crim. App.), cert. denied (Tenn. 1975).

This court must now review the issues presented for review with these rules in mind.

## II.

The State of Tennessee contends exigent circumstances existed which permitted the officers to enter the Chamberses' residence without complying with the "knock and announce" rule. The state argues the image one of the officers saw when approaching the residence created the exigent circumstances justifying noncompliance with the rule. The Chamberses contend the trial court found there were no exigent circumstances. They argue the evidence does not preponderate against the findings of fact made by the trial judge. Moreover, the trial court did not believe the officer's testimony. In ruling, the trial court indicated it did not believe Officer Davis was a credible witness, stating:

4

And the way they word things [in the Curtis search warrant] like they didn't say he [Curtis] arrived during the search, they say present during the search. They know they've got an iffy case and they try to sweeten it up the best they can, and categorize the testimony by Officer Davis and also Director Shires in that regard as being sort of borderline. We're trying to cast it in the best light we can. We saw somebody at the window and it looked like he was doing something hurriedly. Well, you saw him at the window, maybe you didn't see him at the window. How do you know what he's doing if he leaves the window?

So, I rule in this case that the warrant is good. Execution was bad because of Rule 41(e) and there's been no showing of sufficient circumstances to warrant deviation of the requirement of the rule that you announce your purpose and therefore the evidence in that case [Chambers] will be suppressed. (Emphasis added).

This court must now explore the "knock and announce" rule and determine whether the State of Tennessee established exigent circumstances permitting the officers to enter the Chamberses' residence without complying with the rule.

## A.

This jurisdiction has adopted the "knock and announce" rule. Rule 41(e), Tennessee Rules of Criminal Procedure, states:

If after notice of his authority and purpose a peace officer is not granted admittance, or in the absence of anyone with authority to grant admittance, a peace officer with a search warrant may break open any door or window of a building or vehicle, or any part thereof, described to be searched in the warrant to the extent that it is reasonably necessary to execute the warrant and does not unnecessarily damage the property.

Thus, a law enforcement officer who is charged with the execution of a search warrant must give (a) notice of his authority (i.e., he is a police officer, a deputy sheriff, or an agent of the Tennessee Bureau of Investigation) and (b) the purpose of his presence at the structure to be searched (i.e., the execution of a search warrant, before making a forced entry into the structure). State v. Lee, 836 S.W.2d 126 (Tenn. Crim. App. 1991); State v. Fletcher, 789 S.W.2d 565 (Tenn. Crim. App.), per. app. denied (Tenn. 1990). See United States v. Bates, 84 F.3d 790, 794 (6th Cir. 1996); United States v. Becker, 23 F.3d 1537,

5

1541-42 (9th Cir. 1994). The failure to comply with this rule, absent exigent circumstances, results in the exclusion of any evidence seized under color of the warrant. Lee, 836 S.W.2d at 128-29; Fletcher, 789 S.W.2d at 566; Bates, 84 F.3d at 795.

This rule is not new. Its antecedence can be traced to Semayne's Case, 5 Coke Rep. 91(a), 77 Eng. Rep. 194 (K.B. 1603). In Semayne, the court held that:

> [i]n all cases where the King is party, the sheriff may break [the party's] house, either to arrest him, or do other execution of the King's process, if otherwise he cannot enter. But before he breaks it he ought first to signify the cause of his coming, and make request to open the doors.

5 Coke Rep. at 91(b), 77 Eng. Rep. at 195-96.

In Wilson v. Arkansas, 514 U.S. 927, 115 S.Ct. 1914, 131 L.Ed.2d 976 (1995), the United States Supreme Court reviewed the common law decisions pertaining to the "knock and announce" rule. The Court concluded the framers of the Constitution intended to make the "knock and announce" rule a part of the Fourth Amendment to the United States Constitution. The Court said in ruling:

> Our own cases have acknowledged that the common law [sic] principle of announcement is "embedded in Anglo-American law," . . . but we have never squarely held that this principle is an element of the reasonableness inquiry under the Fourth Amendment. We now so hold. Given the longstanding common-law endorsement of the practice of announcement, we have little doubt that the Framers of the Fourth Amendment thought that the method of an officer's entry into a dwelling was among the factors to be considered in assessing the reasonableness of a search or seizure. Contrary to the decision below, we hold that in some circumstances an officer's unannounced entry into a home might be unreasonable under the Fourth Amendment.

514 U.S. at 934, 115 S.Ct. at 1918, 131 L.Ed.2d at 982 (citations omitted).

The "knock and announce" rule serves three purposes. First, the rule provides a form of protection from violence and assures the safety and security of both the occupants of the dwelling and the officers executing the search warrant. Lee, 836 S.W.2d at 128. Second, the rule protects the privacy of the occupant living in the dwelling. Id. Third, the rule prevents needless destruction of property. Id.

The rule requires officers to "wait a reasonable period of time before [they] break and enter" and provides that the occupant of the dwelling "be given a reasonable

6

opportunity to surrender his privacy voluntarily." 2 LaFave, Search and Seizure, § 4.8(c) at 278 (2nd ed. 1987). See People v. Marinez, 160 Ill. App. 3d 349, 352, 112 Ill. Dec. 193, 196, 513 N.E.2d 607, 610 (1987), cert. denied, 488 U.S. 868, 109 S.Ct. 175, 102 L.Ed.2d 144 (1988); State v. Carufel, 112 R.I. 664, 314 A.2d 144, 146 (1974). The act of knocking as the officer opens the door and enters the premises does not comply with the rule. Lee, 836 S.W.2d at 128. See State v. LaPonsie, 136 Ariz. 73, 74-75, 664 P.2d 223, 224-25 (1982); People v. Benjamin, 71 Cal. 2d 296, 78 Cal. Reptr. 510, 455 P.2d 438 (1969); Marinez, 160 Ill. App. 3d at 352, 112 Ill. Dec. at 196, 513 N.E.2d at 610; State v. Defiore, 64 Ohio App. 115, 119, 411 N.E.2d 837, 839 (1979); Commonwealth v. DeMichel, 442 Pa. 553, 277 A.2d 159 (1971); State v. Lowrie, 12 Wash. App. 155, 157, 528 P.2d 1010, 1011 (1974).

**B.**

There are exceptions to the "knock and announce" rule. Officers may forego the requirement to advise the occupants of their authority and provide a statement of their purpose for seeking admittance into the structure if exigent circumstances exist. Keith v. State, 542 S.W.2d 839 (Tenn. Crim. App.), cert. denied (Tenn. 1976). See Richards v. Wilson, ____ U.S. ____, 117 S.Ct. 1416, 137 L.Ed.2d 615 (1997). The state has the burden of establishing facts and circumstances which constitute exigent circumstances. The state must establish "more than a mere hunch or suspicion before an exigency can excuse the necessity for knocking and announcing their presence." Bates, 84 F.3d at 795. See United States v. Radka, 904 F.2d 357, 362 (6th Cir. 1990); United States v. Stewart, 867 F.2d 581, 585 (10th Cir. 1989). Nor may exigent circumstances be found by a court if the circumstances are predicated upon general fears of the officers executing the search warrant. Becker, 23 F.3d at 1541. Furthermore, officers may not create exigent circumstances as a subterfuge for entering a residence without complying with the "knock and announce" rule. Lee, 836 S.W.2d at 129.

As a general rule, it is sufficient for the state to show that (a) a person within the dwelling knows of the officer's authority and purpose; (b) the officers have a justified belief someone within the dwelling is in immediate peril of bodily harm; (c) the officers have a

justified belief those inside the dwelling are aware of their presence and are engaged in escape or the destruction of evidence; (d) a person inside the dwelling is armed and is either likely to use the weapon or become violent; or (e) a person inside the dwelling has threatened an officer's safety, possesses a criminal record reflecting violent tendencies, or has a verified reputation of a violent nature. Richards, supra; Bates, 84 F.3d at 795; United States v. Finch, 998 F.2d 349, 353 (6th Cir. 1993); United States v. Nabors, 901 F.2d 1351, 1354 (6th Cir.), cert. denied, 498 U.S. 871, 111 S.Ct. 192, 112 L.Ed.2d 154 (1990); United States v. Francis, 646 F.2d 251, 256 (6th Cir.), cert. denied, 454 U.S. 1082, 102 S.Ct. 637, 70 L.Ed.2d 616 (1981).

In this case, Officer Davis claimed he saw a silhouette in a window of the house when he arrived to execute a search warrant. He did not know whether the silhouette represented a male or a female. He did not know in which portion of the residence the silhouette was located, and he did not know what portion of the dwelling the silhouette was going to when it left the area rather rapidly. The trial court questioned whether Davis actually saw a person. The court, noting how the officers had misrepresented certain facts contained in the Curtis affidavit, said: "Well, you saw him at the window, maybe you didn't see him at the window. How do you know what he's doing if he leaves the window?" (Emphasis added). The court saw the witness testify and was able to observe the witness's demeanor while he testified. In addition, there is nothing contained in the record which would indicate the person allegedly seen was aware of the officers' authority and purpose.

The officer's statements that the execution team failed to follow the "knock and announce" rule because of safety concerns and the general fear someone would destroy the evidence were not sufficient to support a finding of exigent circumstances. The officers could not point to any circumstance which led them to believe someone was about to destroy the evidence. As previously stated, circumstances which are predicated upon generalized fears of the officers executing the search warrant will not support a finding of exigent circumstances. Becker, 23 F.3d at 1541.

The record is silent as to whether the officers had any information indicating Keith Chambers kept weapons inside his residence, was likely to use a weapon or become

violent, had threatened an officer in the past, had a criminal record reflecting violent tendencies, or had a reputation for violence or a violent nature in the community. None of the other factors constituting exigent circumstances are present in this case.

The safety of law enforcement officers is a concern of this court. No civilized person wants to see another person injured, particularly a public servant who protects the community. However, this court must consider the constitutional and other rights of a person who occupies a residence in the community. The Chamberses had a right to privacy in their residence. One of the purposes of the "knock and announce rule" is the protection of this privacy right. The State of Tennessee failed to show sufficient facts and circumstances to establish exigent circumstances which would have overridden the Chamberses' right to privacy. Therefore, the search of the residence and the seizure of the illicit narcotics were constitutionally unreasonable pursuant to the Tennessee Constitution and the Fourth Amendment of the United States Constitution. Wilson, supra.

This issue is without merit.

## III.

Two issues were litigated regarding Norman Curtis. The first issue was Curtis's detention and the search of his person and truck when he arrived at the Chamberses' residence. The second issue concerned the search of Curtis's residence under color of a search warrant. Shelly Bragg lived with Curtis at his residence.

The State of Tennessee has framed the issue in the following manner: "Was there probable cause for the officers to detain and search appellee Norman Curtis (or were there exigent circumstances) so that the warrantless search was reasonable under the circumstances." The appellees frame the issue as follows: "Whether the trial court erred in granting the motion to suppress of the defendants Norman Curtis and Shelly Bragg as to both the search of the person of Norman Curtis, as well as the subsequent search of the residence." In short, the state simply challenges the trial court's ruling regarding the search of Curtis when he arrived at the Chamberses' residence. The state does not raise an issue concerning the trial court's ruling on the search of Curtis's residence. On the other hand,

9

the appellees raise both issues.  Therefore, this court will address both issues.

## A.

Norman Curtis arrived at the Chamberses' residence while the officers were executing the search warrant.  He walked towards the back door.  Two officers exited the residence and confronted Curtis.  The officers admitted they detained Curtis and searched his person.  Apparently, there were no bulges detected in his clothing.  The officers discovered Curtis was not armed.  The officers removed Curtis's billfold, searched it, and found the duplicate of the label affixed to the package containing the crystal methamphetamine.

As the affidavit given in support of the issuance of the search warrant for Curtis's residence stated, the officers had obtained information that Curtis was involved in the sale and delivery of crystal methamphetamine.  However, the source of some of the information was six months old when the affidavit supporting the issuance of the warrant was executed; another source of information was eighteen months old when the affidavit was executed.  Officer Davis testified he had current information regarding Curtis's connection with crystal methamphetamine.  He stated a reliable, confidential informant who "had been around it -- seen it going on" provided him with this information two weeks prior to the execution of the affidavit.  The record does not reveal when the confidential informant "had been around it -- seen it going on."  Furthermore, this information was not included in the affidavit given to support the issuance of the search warrant for Curtis's residence.

The State of Tennessee argues the officers had probable cause to arrest Curtis.  In the alternative, the state argues it had probable cause to search Curtis.  Due to the fact the confidential informant did not reveal when he "had been around it -- seen it going on," the officers did not have either probable cause to arrest Curtis or search his person.

## (1)

There is a split of authority on whether an officer executing a search warrant can

10

detain and frisk a transient visitor to the premises being searched. A transient visitor may be defined as a person who (a) arrives at the premises being searched while the search is in progress, (b) does not reside inside the dwelling or have a property interest in the dwelling, and (c) is not named in the search warrant as a party to be searched under color of the search warrant. However, it is clear that an officer does not, as a general rule, have the right to search a transient visitor. Baker v. Monroe Township, 50 F.3d 1186, 1194 (3d Cir. 1995); United States v. Branch, 178 U.S. App. D.C. 99, 106, 545 F.2d 177, 184 (1976); United States v. Micheli, 487 F.2d 429, 431-32 (1st Cir. 1973). In United States v. Clay, 640 F.2d 157, 161 (8th Cir. 1981), the court said the "fourth amendment does not authorize the detention and search of all persons who may be present [when the officers arrive to execute a search warrant] . . . or all person's who may enter a premises." (Citations omitted). As a general rule, the transient visitor retains his expectation of privacy. Micheli, 487 F.2d at 432.

Whether an officer may detain and frisk a transient visitor involves an analysis and interpretation of two seminal cases: Michigan v. Summers, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981) and Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

In Terry a police officer became suspicious after watching three men over a period of time. The men appeared to be "casing a job, a stickup." 392 U.S. at 6, 88 S.Ct. at 1872, 20 L.Ed.2d at 897. The officer approached the three men and identified himself as a police officer. He asked the men for their names. Fearing one or more of the three men might have had a weapon, the officer frisked Terry on the outside of his clothing. He discovered a bulge which appeared to be a pistol. He removed a .38 revolver from the left breast pocket of Terry's coat. Id. The officer also discovered a pistol on Chilton, another of the three men. Katz, the third man, was not armed. Id. The United States Supreme Court said the pivotal question in this case was the reasonableness of the officer's interference with the personal security and privacy of the three men at the point he detained and frisked them. 392 U.S. at 9, 88 S.Ct. at 1873, 20 L.Ed.2d at 899. The Court held that when an officer has reasonable and specific facts, coupled with the rational inferences which may be drawn from these facts, the officer may frisk a suspicious person

11

if the officer is "justified in believing" the citizen "is armed and presently dangerous to the officer or others." 392 U.S. at 23-24, 88 S.Ct. at 1881, 20 L.Ed.2d at 907-08. In other words, the circumstances available to the officer must warrant the belief his safety or the safety of other citizens is in danger. When a frisk is warranted, the frisk must be strictly limited to what is minimally necessary to determine whether the suspicious person is armed, and, if so, to disarm him.

The touchstone of a Terry intrusion is the reasonableness of the intrusion. When determining the reasonableness of a Terry intrusion, the court must balance the needs of law enforcement officers against the burden being placed upon the affected citizen. In addition, the court must consider the relationship between a law enforcement officer's actions in conducting a Terry stop and frisk for weapons, if warranted, and the officer's reasons for stopping the citizen. See United States v. Sharpe, 470 U.S. 675, 682-83, 105 S.Ct. 1568, 1573-74, 84 L.Ed.2d 605, 613 (1985).

As the Supreme Court stated in Terry, not all Terry stops necessitate an accompanying frisk. Terry, 392 U.S. at 23-24, 88 S.Ct. at 1881, 20 L.Ed.2d at 907-08; Clay, 640 F.2d at 161. A frisk or protective search is only authorized when a law enforcement officer has a reasonable belief that the suspicious person may be armed with a dangerous weapon or may otherwise be dangerous when the citizen is detained. Sibron v. New York, 392 U.S. 40, 64-65, 88 S.Ct. 1889, 1903-04, 20 L.Ed.2d 917, 935-36 (1968).

In Michigan v. Summers, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), officers went to a residence to execute a search warrant. When the officers arrived, Summers was descending the front steps of the residence. The officers asked Summers to assist them in obtaining entry into the residence. The officers detained Summers while they searched the residence. Once the officers found and seized illicit narcotics, they arrested Summers after ascertaining he was the owner of the residence. The officers searched his person and found an envelope containing 8.5 grams of heroin. According to the United States Supreme Court, the dispositive question in this case was "whether the initial detention of respondent [Summers] violated his constitutional right to be secure against an unreasonable seizure of his person." 452 U.S. at 694, 101 S.Ct. at 2590, 69 L.Ed.2d at 344. The Supreme Court held:

12

> If the evidence that a citizen's residence is harboring contraband is sufficient to persuade a judicial officer that an invasion of the citizen's privacy is justified, it is constitutionally reasonable to require that citizen to remain while officers of the law execute a valid warrant to search his home. Thus, for Fourth Amendment purposes, . . . a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted.

452 U.S. at 704-05, 101 S.Ct. at 2595, 69 L.Ed.2d at 351.

In ruling, the United States Supreme Court "examine[d] both the character of the official intrusion and its justification." 452 U.S. at 701, 101 S.Ct. at 2593, 69 L.Ed.2d at 349. The Court observed a judicial officer found probable cause for the issuance of the warrant, and the detention of an occupant of the premises is "less intrusive than the search [of the premises] itself," since most citizens "would elect to remain in order to observe the search of their possessions." 452 U.S. at 701, 101 S.Ct. at 2593, 69 L.Ed.2d at 349. Such a detention "is not likely to be exploited by the officer or unduly prolonged in order to gain more information, because the information the officers seek normally will be obtained through the search and not through the detention." 452 U.S. at 701, 101 S.Ct. at 2594, 69 L.Ed.2d at 349. The detention of the occupant of the premises to be searched "could add only minimally to the public stigma associated with the search itself and would involve neither the inconvenience nor the indignity associated with a compelled visit to the police station." 452 U.S. at 702, 101 S.Ct. at 2594, 69 L.Ed.2d at 349. In short, the Court said the detention was "'substantially less intrusive' than an arrest." 452 U.S. at 702, 101 S.Ct. at 2594, 69 L.Ed.2d at 349. The Court also noted "both the law enforcement interest and the nature of the 'articulable facts' supporting the detention are relevant." Id.

**(2)**

In Baker v. Monroe Township, the transient visitors arrived at the residence to be searched almost simultaneously with the officers executing the search warrant. 50 F.3d at 1188-89. The officers detained the visitors and frisked them for weapons. Id. The court held the officers had the right to detain and frisk these visitors under the peculiar circumstances of this case. In ruling, the court said that while "Summers itself only pertains

13

to a resident of the house under warrant, it follows that the police may stop people coming to or going from the house if police need to ascertain whether they live there." 50 F.3d at 1192 (discussing Michigan v. Summers, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981)). However, Baker makes it clear the officer did not have a right to search the visitors. Id. at 1194.

In United States v. Clay, supra, a transient visitor approached the residence while a search was in progress. An officer frisked the visitor. The frisk revealed a pistol and a small amount of marijuana. 640 F.2d at 158. The appellate court concluded the trial court should have suppressed the evidence. The court said "an officer's pat down of a person [a transient visitor] cannot be justified solely by the individual's mere presence on the premises described in the search warrant." 640 F.2d at 162.

In United States v. Rembert, 838 F. Supp. 1336, 1338 (D. Minn. 1993), a transient visitor went to an apartment and asked to see the person who leased the apartment. There was no evidence to connect the transient visitor to the apartment or the person residing in the apartment. An officer frisked the transient visitor and found the visitor was armed with a pistol. The visitor was charged with being a convicted felon in the possession of a firearm. Id. The court suppressed the pistol as evidence because the officers did not have a reasonable suspicion, based on specific and articulable facts, to justify an investigatory detention pursuant to Terry. The court said in ruling: "The Fourth Amendment does not authorize the search of all persons who may enter a premises during the time of the warrant's execution." 838 F. Supp. at 1339.

**(3)**

In this case, there is some question as to whether the officers had a right to detain and frisk Curtis when he arrived at the Chamberses' residence. The officers apparently did not possess any information which linked Keith Chambers and Curtis. They did have stale information Curtis had been involved with crystal methamphetamine in some capacity. Given these facts, the officers had reasonable and articulable facts to detain Curtis. They also had the right to frisk his outer clothing to determine if he was armed, as

14

weapons are carried by many individuals engaged in illicit narcotics trafficking.

The officers did not have the right to conduct a full search of Curtis's person to determine if he had any "evidence" on his person. Therefore, the removal of Curtis's billfold and the subsequent search of the billfold constituted an unreasonable search within the meaning of the Fourth Amendment to the United States Constitution and Article I, § 7 of the Tennessee Constitution. The search of Curtis's truck was also unreasonable. He had left the truck and was near the back door when the officers confronted him. The state did not develop any facts which would have justified the search of the truck. See New York v. Belton, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981).

## B.

The trial court properly held the affidavit given in support of the issuance of the search warrant for Curtis's residence did not state probable cause.

The salient allegations contained in the affidavit state:

> Affiant states that on February 8, 1995, he talked to law enforcement officers, Sgt. Bob Hunsick and Officer Dan Deleon with the Phoenix, Arizona Airport Narcotics Interdiction Agency and they informed Affiant that they had intercepted a package containing approximately 457½ grams of Methamphetamine which was being shipped via United Postal Service (U.P.S.) to a Keith Chambers of McEwen, Tennessee. The package was being sent from Phoenix, Arizona. This package was forwarded to the 23rd Judicial Drug Task Force. A search warrant was obtained for the Chambers' residence. The U.P.S. package was accepted by Keith Chambers and Agents of the 23rd Judicial Drug Task Force and the 20th Judicial Drug Task Force executed the search warrant and recovered the Methamphetamine. Present during the search was Norman Curtis. Found on Norman Curtis was $350.00 in cash and a U.P.S. shipping receipt with the same U.P.S. package number which was found on the package shipped from Arizona and which contained the Methamphetamine. The U.P.S. receipt showed that the package was shipped to Keith Chambers, Rt. 2, Box 329, McEwen, Tn.. [sic] The U.P.S. receipt showed that the package was shipped from Arizona on February 8, 199 [sic]. Affiant would further state that Norman Curtis stated that he is a self-employed roofer. Norman Curtis stated to Agent Chris Davis, 23rd JDTF that he owns a 1984 Jaguar, 1979 Chevrolet Pick-up and three Harley-Davidson motorcycles. Found in Norman Curtis' 1979 Chevrolet Pick-up which he drove to Keith Chambers' residence was a set of read-out digital scales.

15

Affiant would further state that Sgt. James McWright, 20 JDTF, informed him that he had received information from a reliable criminal informant that Norman Curtis was dealing in the sale of Methamphetamine. Sgt. McWright, with the information provided to him by this informant, was able to arrest Mike Stewart for felony possession of Methamphetamine and obtained a conviction of Mike Stewart for said offense. Sgt. McWright's criminal informant told him that Norman Curtis would obtain Methamphetamine from Mike Stewart. He received this information approximately one and one-half years ago.

Affiant would further state that Agent Chris Davis, 23rd JDTF, informed him that he had received information from a reliable criminal informant that Norman Curtis was involved in the sale and delivery of Methamphetamine and cocaine. Further this Criminal Informant stated that he had seen cocaine in Norman Curtis' residence within the last six months and that he had bought both cocaine and Methamphetamine from Norman Curtis within the last six months. This Criminal Informant has given information against his penal interest in that he admitted to possessing illegal drugs to law enforcement officials and assisted Agent Davis in the recovery of contraband to wit: Methamphetamine.

Affiant would further state that he has received information from a reliable criminal informant that within the last six months he has seen Norman Curtis in the possession of Methamphetamine. This criminal informant has given information in the past which has led to the seizure of illegal narcotics. (Emphasis added).

The information discovered by searching Curtis at the Chamberses' residence was tainted and constituted fruit of the poisonous tree due to the unreasonable search of Curtis's person as set forth above. As a result, the information contained in the first paragraph of the affidavit regarding what was found on Curtis's person and his pickup truck could not be considered in determining whether probable cause existed for the issuance of the search warrant. Bewley v. State, 208 Tenn. 518, 347 S.W.2d 40 (1961); State v. Bowling, 867 S.W.2d 338 (Tenn. Crim. App. 1993). See United States v. Reyes, 922 F. Supp. 818 (S.D. N.Y., 1996).

In Bewley, the sheriff of Washington County and three of his deputies searched the exterior of Bewley's residence and yard for "white whiskey" without the benefit of a search warrant. 208 Tenn. at 621, 347 S.W.2d at 41. The sheriff and his deputies discovered fruit jars containing "white whiskey" beneath the back steps. The sheriff did not seize the jars. Instead, he went to the office of the Johnson City chief of police and had the chief apply for and obtain the issuance of a search warrant predicated solely upon the information the

16

sheriff acquired by the former warrantless search of the Bewley's premises. Id. The fruit jars containing the "white whiskey" were seized under color of the warrant, Bewley was prosecuted for possession of the "white whiskey," and he was convicted of the offense. The Tennessee Supreme Court ruled the search warrant obtained by the chief of police was void. Id.

In Bowling, a Nashville police officer was investigating a hit-and-run accident which resulted in the death of a person who was walking on the shoulder of a roadway. 867 S.W.2d at 339. The officer received an anonymous telephone call three days after the accident. The caller advised the officer the vehicle involved in the hit and run accident could be found at Bowling's residence. Id. The officer, accompanied by two Wilson County deputy sheriffs, went to the Bowling residence. No one was home. One of the deputies told the officer he saw a Ford Bronco, brown in color, in the garage. The officer got on his hands and knees to look into the garage through an eighteen-inch opening at the bottom of the garage door. With his head almost on the ground, the officer was able to see the brown Bronco and determined there was damage to the front of the vehicle. Id. at 340. The officer subsequently obtained a search warrant based on the information he obtained from the warrantless search, which this court found to be unreasonable. In determining whether the affidavit used to obtain the search warrant contained sufficient probable cause, this court found the evidence used to obtain the search warrant was tainted and therefore inadmissible. Id. at 341-42.

This court parenthetically notes the affidavit given to obtain the search warrant for the Curtis residence states Curtis was "present during the search." As previously noted, Curtis was not at the Chamberses' residence when the officers arrived to search the residence. Curtis arrived after the officers had commenced the search of the premises.

## C.

The information contained in the last four paragraphs of the affidavit were admittedly received in two separate transactions. The information was received "approximately one and one-half years" and "within the last six months" prior to the date the affidavit was given

17

in support of the search warrant for Curtis's residence. The question this court must resolve is whether information this stale can constitute probable cause for the issuance of a search warrant.

When a law enforcement officer executes an affidavit in support of the issuance of a search warrant, the allegations contained in the affidavit should state the nature and source of the information received from a confidential informant so the magistrate asked to issue the search warrant can determine whether probable cause exists for the issuance of the warrant. Owens v. State, 217 Tenn. 544, 550, 399 S.W.2d 507, 510 (1965). Before a magistrate can find the existence of probable cause, the affidavit must allege that the contraband sought to be seized or the illegal activity in question exists at the moment the search warrant is to be issued. Sgro v. United States, 287 U.S. 206, 210-12, 53 S.Ct. 135, 142, 77 L.Ed. 260, 262-63 (1932); Bentley v. State, 552 S.W.2d 778, 779-80 (Tenn. 1977); Larkins v. State, 213 Tenn. 520, 524-25, 376 S.W.2d 459, 461-62 (1964) (the affidavit alleged the information supporting the issuance of the search warrant was received after the warrant was issued); Waggener v. McCanless, 183 Tenn. 258, 261, 191 S.W.2d 551, 553 (1946); Everett v. State, 182 Tenn. 22, 26, 184 S.W.2d 43, 44-45 (1944); Harvey v. State, 166 Tenn. 227, 228, 60 S.W.2d 420 (1933) (the affidavit alleged the information supporting the issuance of the warrant was received after the warrant was issued).

Based upon the authorities cited, the affidavit failed to state probable cause for the issuance of the search warrant for Curtis's residence. The information contained in the affidavit was received eighteen months and six months prior to the execution of the affidavit. This information was stale. United States v. Reyes, 922 F. Supp. 818, 826-27 (S.D. N.Y. 1996) (information which was eighteen months old when warrant was issued was stale and affidavit failed to establish probable cause). See State v. Starks, 658 S.W.2d 544, 546 (Tenn. Crim. App. 1983) (information received more than two months, standing alone, was stale and too remote to establish probable cause). In short, the affidavit did not establish the activity alleged in the warrant was occurring at the moment the search warrant was issued.

18

_____
JOE B. JONES, PRESIDING JUDGE

CONCUR:


_____
WILLIAM M. BARKER, JUDGE


_____
THOMAS T. WOODALL, JUDGE