# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
May 16, 2001 Session

## STATE OF TENNESSEE v. KEITH A. OTEY

**Direct Appeal from the Criminal Court for Davidson County**
**No. 99-D-3056     Cheryl Blackburn, Judge**

---

**No. M2000-01809-CCA-R3-CD - Filed April 16, 2002**

---

The Defendant, Keith A. Otey, was convicted one count of driving on a revoked license and one count of possession of .5 grams or more of crack cocaine with the intent to sell or deliver. After a sentencing hearing, the trial court sentenced the Defendant as a Range I standard offender to ten days for the revoked license conviction and ten years and a $2,000 fine for the drug conviction. The sentences were to be served concurrently. On appeal, the Defendant argues that the trial court erred in (1) denying the Defendant's motion to suppress evidence seized from and a statement made by the Defendant as a result of an illegal stop; (2) allowing the State to introduce evidence of a prior cocaine sale made by the Defendant; (3) allowing hearsay evidence regarding the Defendant's prior cocaine sale; and (4) ruling that a ten-year-old incident involving the Defendant giving a false name to a police officer could be used to impeach the Defendant if he chose to testify. We reverse the judgment of the trial court and remand for further proceedings consistent with this opinion.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Reversed and Remanded.

JERRY SMITH, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and NORMA MCGEE OGLE, JJ., joined.

C. Dawn Deaner, Assistant Public Defender, Nashville, Tennessee, for appellant, Keith A. Otey.

Paul G. Summers, Attorney General & Reporter; Elizabeth B. Marney, Assistant Attorney General; Victor S. Johnson, District Attorney General; and Bret Gunn, Assistant District Attorney General, for appellee, State of Tennessee.

### OPINION

In June of 1998, Officer Joseph Ladnier of the Metro Police Department in Nashville began an investigation of Andre Green, an alleged heroin dealer. The investigation culminated on December 14, 1998, when Officer Ladnier purchased a large amount of heroin from Green and then placed him under arrest at 7 p.m. Earlier that day, representatives from the Federal Drug

Enforcement Agency, the National Guard Intelligence Drug Unit, and the Metro Police Department began surveillance of Green's home. After Green's arrest, Officer Ladnier obtained a search warrant for Green's home, ordered the surveillance team to stop anyone leaving Green's residence, and proceeded to the home to execute the warrant. Despite several months of investigation, Officer Ladnier had never seen or heard of the Defendant prior to the date of his arrest.

At approximately 8 p.m., the surveillance team observed the Defendant arrive at Green's residence. Using night vision goggles and thermal imaging equipment, Sergeant Rick Goodrich observed the Defendant "touch hands" and engage in a conversation with Sammy Crawford, a man present at the residence. Sergeant Goodrich had observed Crawford use and sell drugs previously that day. The Defendant spoke with Crawford for twenty minutes and then left. Sergeant Crawford did not see the Defendant and Crawford physically exchange any objects.

As the Defendant was leaving in his van, he passed Officer Ladnier who was approximately 400 feet away from Green's residence as he approached to execute the search warrant. Officer Ladnier was then informed by the surveillance team that the van the Defendant was driving had just left the Green residence, and Ladnier ordered Officer Damien Huggins to stop the Defendant for investigation. Officer Ladnier did not see the Defendant engage in any illegal activity, but was concerned that residents of the house would have heard of Green's arrest and attempt to remove drugs, guns, or money from the home.

Officer Huggins stopped the van and asked the Defendant if he had a valid driver's license. The Defendant replied that his license had been revoked, and Officer Huggins asked the Defendant to step out of the van. Officer Huggins then asked the Defendant if he had any weapons or drugs in his possession. The Defendant admitted that he had drugs in his pocket. Officer Huggins seized 10.1 grams of crack cocaine and $271 from the Defendant.

## DEFENDANT'S MOTION TO SUPPRESS

The Defendant first contends that the trial court erred by denying his motion to suppress the evidence and statement obtained as a result of Officer Huggins' investigatory stop. The Defendant argues that the evidence was obtained as the result of an illegal stop in violation of his rights under the Fourth Amendment to the United States Constitution and Article 1, section 7 of the Tennessee Constitution.

When reviewing a trial court's ruling on a motion to suppress, "questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Findings of fact made by a trial court in ruling on a motion to suppress are binding upon this Court unless the evidence preponderates against the findings. See id. However, the application of the law to the facts found by the trial court is a question of law which this Court reviews de novo. See State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

The Fourth Amendment to the United States Constitution, made applicable to the States by the Fourteenth Amendment, provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized.

Article I section 7 of the Tennessee Constitution provides that

> people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures; and that general warrants, whereby an officer may be commanded to search suspected places, without evidence of the fact committed, or to seize any person or persons not named, whose offences are not particularly described and supported by evidence, are dangerous to liberty and ought not to be granted.

Both of these constitutional provisions are intended to "safeguard the privacy and security of individuals against arbitrary invasions of government officials." Camara v. Municipal Court, 387 U.S. 523, 528, 87 S. Ct. 1727, 1730, 18 L. Ed. 2d 930 (1967); see also State v. Keith, 978 S.W.2d 861, 865 (Tenn. 1998).

Under both the federal and state constitutions, warrantless seizures are presumed unreasonable and evidence obtained from such a seizure should be suppressed unless the State demonstrates by a preponderance of the evidence that the search or seizure was conducted pursuant to an exception to the warrant requirement. See Coolidge v. New Hampshire, 403 U.S. 443, 454-455, 91 S. Ct. 2022, 2032, 29 L. Ed. 2d 564 (1971); State v. Watkins, 827 S.W.2d 293, 295 (Tenn. 1992). An investigatory stop of an automobile is such a seizure. See Colorado v. Bannister, 449 U.S. 1, 4 n.3, 101 S. Ct. 42, 44 n.3, 66 L. Ed. 2d 1 (1980); State v. Pulley, 863 S.W.2d 29, 30 (Tenn. 1993).

One exception to the warrant requirement was set forth by the United States Supreme Court in Terry v. Ohio, 392 U.S. 1, 21, 88 S. Ct. 1868, 1880, 20 L. Ed. 2d 889 (1968). The Terry court held that a police officer may temporarily seize a citizen if the officer has a reasonable suspicion based upon specific and articulable facts that a criminal offense has been, is being, or is about to be committed. See id. Likewise, an investigatory stop of an automobile is constitutional if the police officer has a reasonable suspicion, supported by specific and articulable facts, that the occupants of the vehicle have committed, are committing, or are about to commit a criminal offense. See United States v. Cortez, 449 U.S. 411, 417, 101 S. Ct. 690, 694, 66 L. Ed. 2d 621 (1981); Yeargan, 958, S.W.2d at 631; Watkins, 827 S.W.2d at 294.

In determining whether a police officer has a reasonable suspicion, supported by specific and articulable facts, a court must consider the totality of the circumstances including, but not limited

to, the officer's personal objective observations, information obtained from other officers, information obtained from citizens, and the pattern of operation of certain criminals. See Cortez, 449 U.S. at 417, 101 S. Ct. at 695; Watkins, 827 S.W.2d at 294. The police officer "must be able to articulate something more than an inchoate and unparticularized suspicion or hunch." United States v. Sokolow, 490 U.S. 1, 7-8, 109 S. Ct. 1581, 1585, 104 L. Ed. 2d 1(1989).

In the present case, Officer Huggins stopped the Defendant at the request of Officer Ladnier. Neither Officer Huggins nor Officer Ladnier observed the Defendant enaging in any illegal or suspicious activity; however, Officer Ladnier was concerned that anyone leaving Green's home was involved in some form of illegal activity. Sergeant Goodrich had observed the Defendant converse with a known drug dealer and user for twenty minutes. However, neither Officer Huggins, who made the stop, nor Officer Ladnier, who ordered the stop, were aware of the sergeant's observations. The Defendant was stopped because he was leaving a home on which a search warrant was soon to be executed, though the warrant had not yet been executed and the Defendant was not observed engaging in any illegal or suspicious activity. The trial court upheld the stop of the Defendant based on the recent arrest of Green and the fact that the house was "clearly connected with drugs."

Because the Defendant was not involved in any illegal or suspicious activity while being observed by either Officer Ladnier or Officer Huggins, the question before this Court is whether an officer may have a reasonable suspicion, supported by specific and articulable facts, that a defendant has engaged, is engaging, or is about to engage in illegal activity when the officer witnesses that defendant leave a home where a search warrant is soon to be executed. While no Tennessee court has directly addressed this question, we find one Tennessee case and one case from the Michigan Court of Appeals instructive.

In State v. Curtis, 964 S.W.2d 604 (Tenn. Crim. App. 1997), this Court upheld a stop and frisk of a defendant who arrived at a residence while the police were searching for methamphetamines pursuant to a search warrant. This Court noted that, in general, officers do not have a right to search such a visitor, but, because the officers in Curtis were aware of the defendant-visitor's history involving methamphetamines, the trial court found that the officers had a reasonable suspicion to frisk the defendant. Id. at 614. However, the search of the defendant based upon the same suspicion was not supported by probable cause and, therefore, required the suppression of the drugs found in the defendants wallet. Id. The Curtis decision seems to recognize that law enforcement officers do not have the right to detain or frisk a visitor to a residence in which a search warrant is being executed absent some basis for suspicion in addition to being present at the home in question. Id.

In People v. Coscarelli, 493 N.W.2d 525 (1992), an undercover officer, who was observing a residence while awaiting a search warrant, observed the defendant approach the residence, enter the residence, and leave approximately seven minutes later. The defendant's arrival at the residence came two and a half hours after the arrest of the owner of the residence in a controlled drug buy. The officer did not observe the Defendant engage in any suspicious or illegal activity, but was instructed to stop all vehicles leaving the residence before the execution of the search warrant. Id. The officer

subsequently stopped the defendant's vehicle as it left the premises, and a search revealed cocaine in the defendant's jacket pocket. In suppressing the cocaine seized from the defendant the Michigan Court of Appeals stated that

> [w]e are of the opinion that the police did not possess sufficient reasonable, particularized, and articulable suspicion that this particular defendant was engaged in criminal activity. Defendant's subsequent presence at the location of the earlier controlled narcotics purchase provides no particular basis for suspicion concerning his participation in criminal activity. As noted by defendant, he could have been at the house for any number of reasons. His presence is not sufficient in and of itself to give rise to a particularized suspicion of criminal activity. It cannot be said that every person entering or leaving this house is likely to have been engaged in the purchase of narcotics. The degree of suspicion attached to his conduct is insufficient to serve as the sole ground for a stop and seizure. Although such conduct might contribute to a finding of reasonable suspicion if viewed along with other suspicious acts, the act of staying at the house for only a short time does not provide that needed support. Because the officers could only speculate about what defendant was doing at the house, they lacked the requisite particularized suspicion, based on objective observations, necessary to justify their investigative stop.

Id. (citations omitted).

While we recognize that Coscarelli is not controlling on this Court, we agree with the reasoning set forth by the Michigan Court of Appeals. As the United States Supreme Court stated in Ybarra v. Illinois, 444 U.S. 85, 91, 100 S. Ct. 338, 342, 62 L. Ed. 2d 238 (1979), "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." The Defendant's presence at Green's residence, without more, does not establish a reasonable suspicion to justify the stop of the Defendant's vehicle. Accordingly, the Defendant's motion to suppress the evidence and statements taken as a result of the unreasonable stop must be granted and the case remanded for further proceedings consistent with this opinion.

While our conclusion that the results of the investigatory stop must be suppressed disposes of the Defendant's appeal, we address the remaining issues in order to facilitate any further appellate review.

**PRIOR BAD ACTS**

Next, the Defendant contends that the trial court erred in finding that evidence of a previous cocaine sale and a prior criminal impersonation conviction were admissible. Prior to trial, the trial court ruled that evidence of a previous sale of cocaine by the Defendant to a police officer was

admissible in the State's case-in-chief and that the Defendant's prior conviction for criminal impersonation was admissible for impeachment purposes if the Defendant chose to testify.

Prior Sale of Cocaine

Prior to trial the State filed a motion in limine requesting permission, pursuant to Tennessee Rule of Evidence 404(b), to introduce evidence that on February 24, 1994, the Defendant sold crack cocaine to an undercover police officer. In granting the State's motion, the trial court found by clear and convincing evidence that the alleged sale took place. The trial court also found that the sale was probative on the material issue of intent and that, because the sale involved crack cocaine, the probative value of the evidence outweighed its prejudicial effect.

Evidence of a defendant's prior crimes, wrongs, or acts is generally not admissible to prove that he committed the crime in question. See Tenn. R. Evid. 404. Such evidence carries the inherent risk of the jury convicting the defendant of a crime based upon his bad character or propensity to commit a crime, rather than the strength of the evidence. See State v. Rickman, 876 S.W.2d 824, 828 (Tenn. 1994). The risk is greater when the prior bad acts are similar to the crime for which the defendant is on trial. See id. However, Tennessee Rule of Evidence 404(b) states that evidence of prior crimes, wrongs, or acts may be admissible when it is probative of material issues other than conduct conforming with a character trait. Evidence of a defendant's criminal character is admissible to prove: (1) the use of "motive and common scheme or plan" to establish identity, (2) to establish the defendant's intent in committing the offense on trial, and (3) to "rebut a claim of mistake or accident if asserted as a defense." State v. McCary, 922 S.W.2d 511, 514 (Tenn. 1996).

In order to admit such evidence, a trial court must, upon request, hold a hearing outside the jury's presence and determine that a material issue exists that does not concern conduct conforming with a character trait and must, upon request, state on the record the material issue, the ruling, and the reasons for admitting the evidence. See Tenn. R. Evid. 404(b). The trial court must also determine that the probative value of the evidence outweighs the danger of unfair prejudice. Id. If the trial court follows the procedure set forth in Rule 404(b), an appellate court may only disturb the trial court's decision upon a finding of an abuse of discretion. See State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997).

The State relies on two cases from this Court in support of the trial court's ruling. In State v. Johnny Wayne Tillery, No. 01C01-9506-CC-00182, 1998 Tenn. Crim. App. LEXIS 421, at *26 (at Nashville, March 30, 1998), and State v. Clarence Marley Cooper, No. 205, 1990 Tenn. Crim. App. LEXIS 63, at *7-*8 (at Knoxville, January 22, 1990), this Court affirmed the trial courts' rulings allowing evidence of previous drug sales by the defendants. However, in Wayne and Cooper, the prior wrongs or acts of the defendants bore some relation, either in time or scheme, to each other. In the present case, the prior drug sale of the Defendant occurred six years before trial and bore no relationship to the current charge. There is no logical connection or relationship between the Defendant's prior drug sale and the Defendant's possession of drugs in this case. Rather, there is only the extrapolation that, if the Defendant sold drugs previously, he must have intended to sell the drugs in his possession in this case. Such an extrapolation is impermissible. See State v. Leslie

<u>Willis</u>, No. 01C01-9802-CC-00068, 1999 Tenn. Crim. App. LEXIS 715, at \*14-\*17 (at Nashville, July 15, 1999) (finding that the defendant's prior rape conviction had no connection to his charge for committing the present rape without applying the convention that "if he did it before, he probably did it again," and such an inference is impermissible). In addition, admitting this prior conviction as part of the State's case-in-chief has an undue prejudicial effect.

Our supreme court has acknowledged the undue prejudicial effect of such evidence by stating that "when the prior conviction was shown, it may have settled all questions for the jury, allowing them to conclude that because he did it once, more than likely he did it again." <u>State v. Roberts</u>, 703 S.W.2d 146, 147 (Tenn. 1986). Finally, on this point, we conclude that the limiting instruction given by the trial court did not cure the error committed. As we held in <u>State v. Walker</u>, 29 S.W.3d 885, 891 (Tenn. Crim. App. 1999),

> [t]here are limits to the human mind. We think to say to any jury, there is evidence here the defendant before you has been guilty of [a prior sale of cocaine] but you are not to consider this in determining his guilty or innocence of the present crime, is at best to severly test the ability of the mind to remove all prejudice therefrom.

<u>Id</u>. (citing <u>Harrison v. State</u>, 394 S.W.2d 713, 717 (Tenn. 1965)).

Accordingly, we find that the trial court erred in allowing the State to introduce evidence of the Defendant's prior sale of cocaine, and the error requires reversal of the Defendant's conviction for possession with intent to sale.

<u>Prior Fraud Conviction</u>
The Defendant also contends that the trial court erred in ruling that prior evidence of a ten-year-old conviction for criminal impersonation was admissible for impeachment purposes if the Defendant chose to testify. After a pretrial hearing on the matter, the trial court ruled that the conviction was probative of the truthfulness of the Defendant if he should testify on his own behalf. Therefore, the trial court stated that she would allow the State to ask the following question on cross-examination: On March 3, of 1988, did you give the name of Bernard Wayne Otey to Officer Hasty? The Defendant did not testify at trial.

Tennessee Rule of Evidence 608(b) allows a party to ask a witness about specific instances of conduct that are probative of the witness' untruthfulness in order to attack the credibility of the witness. The trial court must first determine that the alleged conduct has probative value and that there is a reasonable factual basis for the inquiry. <u>See</u> Tenn. R. Evid. 608(b)(1). If the conduct occurred more that ten years prior to the present prosecution, the party seeking to impeach must provide sufficient advance notice to the adverse party. The trial court must also determine that "the probative value of the evidence, supported by specific facts and circumstances, substantially outweighs its prejudicial effect." Tenn. R. Evid. 608(b)(2). If the adverse party is the defendant in a criminal prosecution, the State must provide reasonable written notice of the impeaching conduct, and the court, upon request, must find that "the conduct's probative value on credibility outweighs

its unfair prejudicial effect on the substantive issues." Tenn. R. Evid. 608(b)(3). The trial court's ruling will only be disturbed upon a finding of an abuse of discretion. See State v. Roberts, 943 S.W.2d 403, 408 (Tenn. Crim. App. 1996), overruled on other grounds by State v. Ralph, 6. S.W.3d 251 (Tenn. 1999).

In finding the prior act to be admissible, the trial court stated that "if he is testifying, his truthfulness is clearly at issue for the jury." There is no finding by the trial court on the record that the probative value of the evidence outweighed the unfair prejudicial effect. The Defendant argues that the probative value for truthfulness of a ten-year-old instance involving the giving of a false name to a police officer is greatly outweighed by the prejudicial effect of the evidence as the evidence conveys to the jury that the Defendant has a prior criminal record. See State v. John Joslin, No. 03C01-9510-CR-00299, 1997 Tenn. Crim. App. LEXIS 903, at *80-*81 (at Knoxville, Sept. 18, 1997). We agree with the Defendant. This is not a case where the Defendant's record reflects a continuing course of conduct that is probative of credibility. The Defendant's criminal impersonation conviction was an isolated event ten years in the past. We conclude that the trial court erred in finding that the prior act was admissible for impeachment purposes.

However, we also conclude that the error was harmless based upon the evidence contained in the record. The Defendant's theory at trial was that he did not intend to sell the cocaine found in his pocket, and, therefore, should be convicted of simple possession, not possession with intent to sell. Officer Huggins discovered 10.1 grams of cocaine on the Defendant which he estimated to have a street value of approximately $1,000. Officer Huggins also stated that in his experience crack cocaine addicts rarely have more than a gram of cocaine at any one time. In light of Officer Huggins' testimony and the amount of cocaine found on the Defendant, we conclude that the trial court's ruling was harmless. See Galmore, 994 S.W.2d at 125 (finding that a trial court's erroneous ruling regarding impeachment evidence was harmless under the facts and circumstances of the case).

### HEARSAY TESTIMONY

Finally, the Defendant argues that the trial court erred in allowing Officer Rollins to testify that the substance he bought from the Defendant in 1994 was .3 grams of cocaine. The Defendant contends that such testimony is hearsay in violation of Rule 801(c) of the Tennessee Rules of Evidence.

While we agree with the Defendant that the officer's statement that the substance sold to him was .3 grams of cocaine was "a statement other than one made by the declarant . . . offered in evidence to prove the truth of the matter asserted" and therefore hearsay, we conclude that the error in admitting the testimony was harmless. See Tenn. R. Evid. 801(c). The crux of the officer's testimony, taken as a whole, was not the weight or identity of the substance, but rather that the Defendant sold the substance to the officer. The officer could have legitimately testified that in 1994 the Defendant sold him a cocaine-like substance. Under the circumstances this testimony would

have been as damning as the officer's hearsay testimony.  We also note that the counsel for the Defendant adequately cross-examined Officer Rollins.  This issue is without merit.

## CONCLUSION

For the foregoing reasons, we conclude that the judgment of the trial court must be REVERSED and REMANDED.

 

 

_____

JERRY L. SMITH, JUDGE